## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7067 | **DATE** | 3/19/2002 |
| **CASE TITLE** | Cora Hazzard vs. Jo Ann B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and recommendation recommending that plaintiff's motion for summary judgment be granted in part and denied in part, and that the case be remanded to the ALJ for further proceedings is hereby entered of record. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | 4 | | Document Number |
|---|---|---|---|---|---|---|---|
| | No notices required. | | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | MAR 20 2002 | | |
| | Notified counsel by telephone. | | | | date docketed | | |
| | Docketing to mail notices. | | | | | | |
| | Mail AO 450 form. | | | | docketing deputy initials | | |
| ✓ | Copy to judge/magistrate judge. | | | | 3/19/2002 | | 25 |
| | | | | | date mailed notice | | |
| IS | courtroom deputy's initials | | U.S. DISTRICT COURT CLERK 02 MAR 19 AM 11:49 | | IS | | |
| | | | Date/time received in central Clerk's Office | 10 | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

MAR 2 0 2002

| | | |
|---|---|---|
| CORA HAZZARD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 00 C 7067 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| JO ANNE B. BARNHART, | ) | Magistrate Judge |
| Commissioner of Social Security,[1] | ) | Martin C. Ashman |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Cora Hazzard seeks judicial review of the Commissioner's decision to deny Hazzard's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Administrative Law Judge (the "ALJ") held that Hazzard was not disabled based on Rule 202.13 of the Medical-Vocational Guidelines (the "Grids"). Hazzard claims that the ALJ erred by failing to analyze the combined effects of Hazzard's impairments on the issues of medical equivalence and Hazzard's residual functional capacity, by failing to develop the record, by improperly discounting the opinion of one of Hazzard's treating physicians, and by improperly discounting Hazzard's testimony about her symptoms. Hazzard also claims that the ALJ's decision is not supported by substantial evidence. For the following reasons, this Court

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Jo Anne B. Barnhart is automatically substituted as defendant in this case.

recommends that Hazzard's Motion for Summary Judgment be granted in part and denied in part, and that the case be remanded to the ALJ for further proceedings.[2]

## I. **Procedural Background**

Hazzard applied for SSI on March 18, 1996, and for DIB on May 8, 1996. (R. at 70, 74.) She alleged that she was disabled due to asthma and an enlarged heart since March 3, 1996. (R. at 70, 89.) The Social Security Administration denied both applications on July 19, 1996. Hazzard timely requested review of the decisions before an administrative law judge.

On July 28, 1998, the ALJ conducted a hearing, eliciting testimony from Hazzard, who was represented by counsel, and Hazzard's husband, Ollie. (R. at 23.) Four months later, in a written decision, the ALJ determined that Hazzard was not disabled based on Grid Rule 202.13. Hazzard filed an appeal with the Appeals Council. The Appeals Council denied Hazzard's request for review (R. at 6-7), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Hazzard now seeks review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[2] This matter comes before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1 for a report and recommendation.

## II.  Factual Background

### A.  Hazzard's Testimony

Hazzard was fifty-three years old at the time of the hearing.  (R. at 28.)  She attended school through the twelfth grade.  (R. at 28.)  She lived with her husband and one of her three children.  (R. at 41.)

Between 1976 and 1996, Hazzard worked as a presser, pressing various types of clothing with a machine that released steam.  To operate the machine, Hazzard was required to pull down the lid of the machine, push a petal with her left foot, and push buttons with her fingers.  (R. at 30.)  The lid of the machine would raise by itself.  (R. at 30.)  Hazzard worked six to eight hours per day, depending on the amount of work available.  (R. at 30.)  She was expected to press about sixty to seventy pieces of clothing per hour, and she had to stand all day.  (R. at 31.)  Hazzard testified that she quit working as a presser in February 1996 because of her asthma and carpal tunnel syndrome.  (R. at 32.)

Hazzard was diagnosed with asthma in 1986.  She had severe asthma attacks in 1986 and 1989, both of which required Hazzard to seek medical treatment at the emergency room.  (R. at 45.)  On both occasions, physicians prescribed Prednisone to treat Hazzard's asthma.  (R. at 46.)  Periodically, Hazzard had asthma attacks while at home.  Sometimes Hazzard would take Prednisone and rest in bed to manage her asthma.  (R. at 47.)  She avoided going to the hospital because she could not afford to pay the medical bills.  (R. at 49.)

Most of Hazzard's asthma attacks occurred at night when she tried to sleep.  (R. at 48.)  Hot and humid conditions as well as cold weather increased the likelihood of an asthma attack.  (R. at 48, 51.)  On a daily basis, Hazzard inhaled two sprays—Asthma Cort and Alupent—to

manage her asthma. (R. at 48, 50.) Every day she was "wheezy," and every night she had difficulty sleeping. (R. at 50-51.) Hazzard felt that she could not work any longer as a presser because the fumes in that type of work environment caused her asthma to "flare up." (R. at 32.) When she worked, Hazzard was short of breath despite using her inhaler more frequently. (R. at 35.)

Hazzard testified that she was diagnosed with carpel tunnel syndrome. (R. at 32.) She believed that the condition was a result of pressing buttons all day long as a presser. (R. at 32.) It caused her right hand and arm to go numb each day. (R. at 32.) Eventually, Hazzard experienced numbness in her neck. (R. at 32.) Sometimes, Hazzard's condition made her hand feel like a "piece of wood." (R. at 36.) Her carpel tunnel syndrome still bothered her, even though she was not working. (R. at 36.) She wore a brace on her right wrist, which she purchased over-the-counter, to alleviate the condition. (R. at 36.)

Hazzard also complained of arthritis in her right shoulder and knee. (R. at 37.) She "had trouble" with her right shoulder all day long; it throbbed like a toothache and caused her constant pain. (R. at 37-38.) To alleviate the right shoulder pain, Hazzard took Tylenol twice a day and applied a heating pad on the shoulder, sometimes two to three times per week. (R. at 38.) The Tylenol did not completely relieve the pain, but it made the right shoulder pain tolerable. (R. at 38.) Hazzard's knee bothered her when she walked up or down stairs and when she moved around. (R. at 40.) She testified that she could stand for about one or two hours before feeling pain in her knee. (R. at 40.) She could walk about one or two blocks. (R. at 40.) Since 1995, the pain in Hazzard's knee has become worse despite taking Tylenol to relieve the pain. (R. at 41.)

Lastly, Hazzard complained of constant chest pain. (R. at 55-56.) She recalled being told that stress caused her chest pain, and she claimed to have an enlarged heart. (R. at 56.)

Because of Hazzard's medical condition, she attended church services and weekly activities less often than she used to. (R. at 44.) She also could not do as much housework as before. (R. at 58.) She needed to sit and rest more frequently to catch her breath and to abate the pain. (R. at 43, 55.) Hazzard could still drive a car to church and back during the daytime. (R. at 59.) In March 1998, Hazzard and her husband traveled to Mississippi for a vacation. (R. at 57.)

### B. Ollie's Testimony

Ollie married Hazzard in 1969. (R. at 60.) He stated that since 1986 Hazzard's asthma has become worse. (R. at 65.) He also stated that Hazzard could not do things with her hands that she was able to do before. (R. at 65.) Mounting medical bills were a cause for concern; Ollie indicated that he and Hazzard avoided going to the hospital or seeking prescriptions from physicians because of insufficient funds. (R. at 61, 65.)

### C. Medical Evidence

Hazzard was admitted to Thorek Hospital on November 12, 1986, for bronchospasm. She denied any chest pain. (R. at 139.) Dr. David Daniels noted that Hazzard had good air exchange in her lungs but that there was bilateral wheezing. (R. at 139.) A chest x-ray and EKG were normal. (R. at 139.) Hazzard complained of right upper extremity pain, but an x-ray of the

right upper extremity was normal. (R. at 139.) At the time of discharge, Hazzard was not wheezing. Dr. Daniels prescribed Theo-Dur and Prednisone. (R. at 139.)

On January 22, 1989, Hazzard was admitted to Christ Hospital and Medical Center with acute asthmatic exacerbation, possibly secondary to acute bronchitis. (R. at 144, 153.) She complained of wheezing and dyspnea. (R. at 144.) Dr. Anastasia Largosa indicated that Hazzard could barely talk upon arrival. (R. at 146.) In a Report of Consultation, Dr. Antanas Razma noted that Hazzard was taking medication to control her asthma. (R. at 153, 154.) Weeks prior to being admitted to the hospital, Hazzard experienced shortness of breath and coughing with some yellowish sputum. (R. at 153.) To treat this condition, she received Prednisone and Phenergan with Codeine from a physician. (R. at 153.) Dr. Razma believed that Hazzard had developed side effects from taking Prednisone intermittently rather than as directed. (R. at 153.) While at Christ Hospital, Dr. Largosa placed Hazzard on a regimen of medicine to control her asthma and bronchitis. (R. at 154.) Nonetheless, during her first night at Christ Hospital, Hazzard continued to experience difficulty breathing. (R. at 154.)

Dr. Razma noted that Hazzard was diagnosed with hypertension in 1972. He mentioned that an EKG was unimpressive and that a chest x-ray was clear. A lung examination on or before January 24 revealed a scattered expiratory wheeze with good air movement in the lungs. (R. at 154.) Hazzard's heart appeared normal and her extremities did not show clubbing, cyanosis, or edema. She was neurologically intact. (R. at 155.) Dr. Razma recommended that Hazzard inhale Proventil instead of Alupent to control her asthma (he felt Proventil was better) and that Hazzard continue taking antibiotics to treat her bronchitis. (R. at 155.)

On March 12, 1995, Hazzard was admitted to Jackson Park Hospital for chest pain. (R. at 166.) Tests revealed nothing significant. (R. at 167-69.) In 1996, Hazzard started seeking treatment for her medical conditions at the Englewood Health Clinic. (R. at 221-26.) Periodically, Hazzard complained of shortness of breath and right arm pain. She was prescribed medication to control her asthma. On November 18, 1996, a physician diagnosed Hazzard with carpel tunnel syndrome. (R. at 224.)

On June 17, 1996, Dr. Georgia Lubben, a treating physician, completed a Cardiac Report. She diagnosed Hazzard with hypertension and anxiety, but noted that Hazzard suffered no end organ damage as a result of the hypertension. (R. at 171.) Dr. Lubben placed no restrictions on Hazzard's ability to engage in physical activity. (R. at 172.) One day later, Dr. Lubben completed a Respiratory Report. She diagnosed Hazzard with asthma with no clubbing, cyanosis, or orthopnea. Breathing sounds were normal. (R. at 175.) Between attacks, Hazzard had clear lungs. She had a "good response" to therapy. (R. at 175-76.) Hazzard could perform work-related activities such as sitting, standing, moving about, lifting, carrying, and handling objects. (R. at 176.)

On July 5, 1996, Dr. Earl Donelan completed a Physical Residual Functional Capacity Assessment without the benefit of reviewing a treating source's statement about Hazzard's physical capabilities. He determined that Hazzard could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation. (R. at 201.) Dr. Donelan observed that Hazzard's asthma was not of listing severity and frequency and that Hazzard's lungs were clear. (R. at 201.) He also noted that Hazzard had no

heart problems. (R. at 201.) Dr. Donelan placed no postural and manipulative limitations on Hazzard. As far as environmental limitations, Hazzard needed to avoid concentrated exposure to fumes, odors, dusts, and gases. (R. at 204.)

Dr. Fecundo Dovale completed an Internal Medicine Consultative Examination on October 11, 1996. At the examination, Hazzard complained of carpal tunnel syndrome, asthma, hypertension, and chest pain. (R. at 177.) The carpal tunnel syndrome caused numbness in Hazzard's fingers and shooting pain in her right arm. Hazzard wore a brace to alleviate the condition. (R. at 177.) Dr. Dovale indicated the absence of an ENG or an evaluation by an orthopaedic surgeon. Hazzard believed that fumes at work aggravated her asthma. She stated that she used her inhaler almost every day. Chest pain occurred while coughing and during deep breathing. (R. at 178.)

Dr. Dovale noted that the air exchange in Hazzard's lungs was fair. He could hear inspiratory and expiratory wheezing. He noticed mild clubbing of the fingernails, but no cyanosis. (R. at 179.) Hazzard's heart was normal. The range of motion of her spine was normal. A shoulder depression test was negative. (R. at 179.) Hazzard's gait was normal, and her ability to grasp was intact. The range of motion of her arms and legs was normal. (R. at 179.) Hazzard had a pinprick deficit in the right upper extremity and the numbness extended to the fingers. Manual dexterity appeared normal. A Babinski test was negative. Cerebellar testing was negative. (R. at 179.) A Tinel's test was negative. Dr. Dovale opined that Hazzard's symptoms were more suggestive of radicular symptoms possibly originating in the right neck, rather than of carpel tunnel syndrome. He indicated no evidence of end organ damage due to hypertension. (R. at 180.)

Dr. Sonia Yballe completed a Psychiatric Evaluation in October 1996. Hazzard denied any psychiatric problems. (R. at 187.) The examination was unremarkable. (R. at 189.) Dr. Carl Hermsmeyer completed a Psychiatric Review Technique in October 1996, finding that Hazzard had a nonsevere personality disorder and a substance addiction disorder that was in remission. (R. at 191-99.)

On October 28, 1996, Dr. Charles Kenney completed a Physical Residual Functional Capacity Assessment without the benefit of reviewing a treating source's statement about Hazzard's physical capabilities. He concluded that Hazzard could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation, even though Hazzard had limited feeling in her right hand. (R. at 210, 212.) Dr. Kenney opined that Hazzard could climb occasionally and stoop, kneel, crouch, and crawl frequently. (R. at 211.) He felt that Hazzard would need to avoid concentrated exposure to fumes, odors, dusts, and gases. (R. at 213.)

Hazzard had routine appointments at the Englewood Health Clinic in 1997 and 1998. On occasion, she complained of asthma attacks. (R. at 242-43.) In September 1998, Dr. Ram Bongu, a treating physician, completed a Pain Report, a Musculoskeletal Defects or Fractures Report, and a Respiratory Report. (R. at 254-61.) In the Pain Report, Dr. Bongu noted that Hazzard experienced tenderness, numbness, and muscle spasms. (R. at 254.) He opined that Hazzard's complaints of pain were within the range that was reasonably related to her physical illnesses of carpal tunnel syndrome and rotator cuff tear, that Hazzard's complaints of shoulder pain were supported by objective evidence, and that Hazzard's pain was relieved (not completely)

with medication. (R. at 254, 256.) Dr. Bongu believed that Hazzard experienced so much pain that she could not work on a sustained basis and that Hazzard would likely experience more pain than she did at that time if she attempted to work. (R. at 256.) Hazzard's condition was listed as stable. (R. at 256.)

In the Musculoskeletal Defects or Fractures Report, Dr. Bongu listed Hazzard's impairments as carpal tunnel syndrome and rotator cuff tear. He stated that the impairments caused Hazzard pain, and that Hazzard's pain was reasonably related to her impairments. (R. at 257.) Dr. Bongu listed Hazzard's condition as stable. He noted that Hazzard was presently receiving treatment at a hand clinic but that she had not received any surgery. (R. at 257.) He indicated that Hazzard had limited range of motion in her right shoulder and that Hazzard's ability to grasp was weak. (R. at 255.)

In the Respiratory Report, Dr. Bongu diagnosed Hazzard with asthma. He noted the absence of clubbing, cyanosis, and orthopnea, and he estimated that Hazzard experienced asthma attacks about two or three times per month with a duration of two days. (R. at 258-59.) Between acute respirator episodes, Hazzard exhibited wheezing, coughing, shortness of breath, and dizziness. (R. at 259.) Hazzard could wash dishes, make beds, wash clothes, cook, drive a car, and walk as able, but she could not dust, sweep, vacuum, shovel snow, cut grass, garden, and rake leaves. (R. at 259-60.) Hazzard's work environment could not involve standing or walking, nor could it contain smoke or dust. (R. at 260.) Dr. Bongu stated that Hazzard could not work at any job that required an eight-hour workday.

In September 1998, Hazzard had a pulmonary function study. (R. at 264.) The test revealed no obstructive lung defect and a mild restrictive lung defect. A physician interpreted this as a good response to the bronchodilator.[3] (R. at 264.)

### III. The ALJ's Decision

After reviewing Hazzard's and Ollie's testimony and the medical evidence, the ALJ determined that Hazzard was not disabled based on Grid Rule 202.13. The ALJ stated that Hazzard had not engaged in substantial gainful activity since February 1996. (R. at 15.) Hazzard set forth the following impairments: asthma, enlarged heart, carpal tunnel syndrome, arthritis, and anxiety. (R. at 15.) The ALJ found that Hazzard's impairments could be severe but that her impairments did not meet or equal in severity the level required for the Listing of Impairments. (R. at 15.) Specifically, neither the medical evidence nor Hazzard's testimony reflected functional limitations consistent with such a severe condition. (R. at 15.)

The ALJ then narrated Hazzard's testimony about her daily activities and commented on the medical evidence. He noted that a November 1986 EKG was normal, that a January 1989 EKG and chest x-ray were normal, and that a March 1995 EKG was normal. He expounded on the findings of Drs. Lubben and Dovale, acknowledging Dr. Dovale's observation that Hazzard had not been evaluated by a neurosurgeon or orthopaedic surgeon. (R. at 16.) Hazzard's visits to

---

[3] We refuse to consider the evidence from Thorek Hospital, dated around December 9, 1998, and from Dr. Jennifer Byrd, dated January 24, 2000. (*See* R. at 270, 279, 285, 288-90.) Although this evidence is part of the administrative record, it cannot be used to contest the ALJ's decision as it was first submitted to the Appeals Council. *See Eads v. Secretary of the Dep't of Health & Human Servs.*, 983 F.2d 815, 817-18 (7th Cir. 1993).

Englewood Health Clinic were briefly discussed, as was Hazzard's September 1998 lung exam at Thorek Hospital.

The ALJ dismissed Dr. Bongu's opinion that Hazzard could not work due to disabling shoulder and wrist pain or asthma because it was offered without explanation, because it was contrary to Dr. Bongu's reported findings, and because it was not supported by the record as a whole. (R. at 17.) The ALJ also discounted Hazzard's testimony that her symptoms precluded her from performing any type of work because such testimony was not supported by the medical evidence and because it was belied by Hazzard's own daily activities. (R. at 18-19.) Hazzard's asthma was mild, her hypertension was controlled with medication, and her right shoulder pain was relieved with Tylenol. (R. at 18-19.) The evidence did not support Hazzard's allegation of having an enlarged heart or of suffering from carpel tunnel syndrome. (R. at 18-19.)

In the end, the ALJ determined that Hazzard was capable of performing a wide range of light work in clean air environments. (R. at 19.) Particularly, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on March 3, 1996, the date the claimant stated she became unable to work, and [she] continues to meet them through December 31, 1996.

2. The claimant has not engaged in substantial activity since February 1996.

3. The medical evidence establishes that the claimant has mild asthma controlled by medication, hypertension, and right shoulder degenerative joint disease, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations and testimony of symptoms precluding work are not credible to the extent alleged as they are not

supported by, nor consistent with, the medical and other evidence as set forth above.

5. The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for that which is greater than light exertionally and would require exposure to dust, fumes, or vapors.

6. The claimant is unable to perform her past relevant work as a dry cleaner presser due to the exposure to chemical fumes.

7. The claimant's residual functional capacity for the full range of light work is reduced by her environmental restrictions.

8. The claimant is currently fifty-three years old, which is defined as closely approaching advanced age.

9. The claimant has a high school education.

10. The claimant does not have any acquired work skills, which are transferrable to the skilled or semiskilled work functions of other work.

11. Based on an exertional capacity for light work and the claimant's age, education, and work experience, Section 404.1569 of Regulations No. 4 and Section 416.969 of Regulations No. 16 and Rule 202.13, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

12. The claimant's capacity for the full range of light work has not been significantly compromised by her additional nonexertional limitations. Accordingly, using the above-cited rule as a framework for decisionmaking, the claimant is not disabled.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(R. at 20-21.)

## IV. Discussion

### A. Standard of Review

Judicial review of the Commissioner's decision to deny benefits encompasses an assessment of the factual basis and legal basis of that decision. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999); *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993). With regard to the ALJ's factual findings, the court's role is limited: if the ALJ's findings are supported by substantial evidence, then the court must affirm the ALJ's decision. *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir. 1992). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Put another way, it is more than a mere scintilla of the evidence, but less than the greater weight of the evidence. *Id.*; *Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). In determining whether substantial evidence exists, the court cannot reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Jones*, 10 F.3d at 523.

The court reviews the ALJ's application of law without deference and without regard to the volume of medical evidence that supports the ALJ's findings. *White*, 167 F.3d at 373. If the ALJ's application of law is not properly grounded, then remand or reversal is warranted. *Cook v. Massanari*, No. 00 C 4157, 2001 WL 755145, at *7 (N.D. Ill. July 2, 2001); *Gavin v. Heckler*, 620 F. Supp. 999, 1000 (N.D. Ill. 1985).

**B.      Analysis of the Combined Effects of Hazzard's Impairments**

Hazzard's first challenge pertains to the ALJ's analysis of Hazzard's impairments. Hazzard criticizes the ALJ for isolating each of Hazzard's impairments and not considering them in combination when determining whether Hazzard's impairments equaled a listed impairment, and when assessing Hazzard's residual functional capacity.

The level of articulation required by an administrative law judge to show that he considered the combined effects of a claimant's impairments is minimal. In *Waite v. Bowen*, the administrative law judge stated, "'The medical evidence establishes that the claimant has a loss of motor and sensory function of the left arm, but he does not have an impairment, or a combination of impairments listed, or medically equal to one listed in Appendix 1, Subpart P, of Social Security Regulations No. 4.'" 819 F.2d 1356, 1359 (7th Cir. 1987). The Seventh Circuit held that was sufficient articulation to show that the administrative law judge considered the combined effects of the claimant's impairments on the issue of medical equivalence. *Id.* In *Nelson v. Bowen*, the administrative law judge stated, "'The evidence does not show any medically determinable impairments which, singly or combined, preclude claimant from engaging in substantial gainful activity.'" 855 F.2d 503, 508 (7th Cir. 1988). The Seventh Circuit found that was sufficient articulation to show that the administrative law judge considered the combined effects of the claimant's impairments with respect to the claimant's ability to perform work. *Id.*

Here, the ALJ found that Hazzard had "mild asthma controlled by medication, hypertension, and right shoulder degenerative joint disease, but that she [did] not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix

l, Subpart P, Regulations No. 4." (R. at 20.) A similar statement appears in the body of the ALJ's decision: "Although the claimant's impairments may be 'severe' . . . they do not meet or equal in severity the level required for the Appendix 1, Listing of Impairments." (R. at 15.) Both statements demonstrate that the ALJ considered the combined effects of Hazzard's impairments on the issue of medical equivalence. It is significant that the ALJ referred to Hazzard as having "impairments," rather than as having an impairment, throughout the decision.[4]

Likewise, we are convinced that the ALJ considered the combined effects of Hazzard's impairments when assessing Hazzard's residual functional capacity. The ALJ found that Hazzard's asthma, hypertension, right shoulder degenerative joint disease, and associated symptoms limited her to performing light work. (R. at 20.) Next, the ALJ reduced Hazzard's range of light work due to her environmental limitations. (R. at 20.) Then, Grid Rule 202.13 was applied by the ALJ because Hazzard's "capacity for the full range of light work has not been significantly compromised by her additional nonexertional limitations." (R. at 21.) This sequential analysis shows that the effects of all of Hazzard's impairments were considered by the ALJ.

---

[4] Hazzard cites to *Sample v. Shalala*, 999 F.2d 1138, 1141-42 (7th Cir. 1993), in this section of her brief. In *Sample*, the claimant argued on appeal that the combined effects of her impairments equaled a specific listing, namely Section 2.07. The Seventh Circuit held that substantial evidence supported the ALJ's decision that the combined effects of the claimant's impairments did not equal Section 2.07. *Sample*, 999 F.2d at 1141-42. Here, Hazzard argues that the ALJ did not "undertake any analysis of the combined effects of [her] impairments" on the issue of equivalence. (Hazzard's Mem. Supp. Mot. Summ. J. at 6.) Hazzard does not develop an argument that the combined effects of her impairments equaled a specific listing, contrary to the findings of the ALJ. Thus, *Sample* is not on point.

## C.    Duty to Develop the Record

Hazzard's contention that the ALJ erred by failing to develop the record relates to statements made by Dr. Dovale in his written report of the Internal Medicine Consultative Examination. With regard to Hazzard's carpel tunnel syndrome, Dr. Dovale pointed out that a Tinel's test was negative. He then stated: "[Hazzard's] symptomatology is more suggestive of radicular symptoms possibly originating in the right neck. But . . . the claimant has a full range of motion in the C spine. The sensory exam was consistent with C5, C6 deficit." (R. at 180.) Hazzard claims that the ALJ should have inquired into these statements before rendering a decision on the existence or severity of Hazzard's carpel tunnel syndrome.

The ALJ has an affirmative duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Gill v. Shalala*, No. 94 C 2299, 1994 WL 649989, at *3 (N.D. Ill. Nov. 16, 1994). Depending on the circumstances, this may require the ALJ to recontact a physician or order an examination. *Cf. Luna v. Massanari*, No. IP 00-1075-C-T/G, 2001 WL 987860, at *5-7 (S.D. Ind. July 18, 2001), *with Rake v. Callahan*, 983 F. Supp. 1181, 1185 (N.D. Ill. 1997). It is always possible to gather additional evidence; exactly how much is enough is a subject on which reasonable minds could differ. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). In recognition of this, and the fact that investigation and exploration cannot continue ad infinitum, district courts generally respect the ALJ's decision to cease investigating and exploring as long as that decision is reasonable. *Luna v. Shalala*, 22 F.3d 687, 692-93 (7th Cir. 1994); *Kendrick*, 998 F.2d at 458.

Here, we find that the ALJ's decision not to gather additional evidence on carpel tunnel syndrome was reasonable. Before him, the ALJ had an opinion from Dr. Bongu concerning

- 17 -

Hazzard's carpal tunnel syndrome, and he had medical notes from Hazzard's routine examinations. We also note that Hazzard's counsel thoroughly questioned Hazzard about her condition at the ALJ hearing. (R. at 32-36.) Dr. Dovale performed a Tinel's test, which was negative. (R. at 180.) He also observed that Hazzard's grip strength and hand and fine finger manipulation were intact. (R. at 179.) Significantly, as the ALJ pointed out, "no clinical objective evidence [exists] to support carpel tunnel syndrome," but rather "[a]ll [of the] evidence of carpel tunnel [syndrome] can be traced to anecdotal origins. Over time, [Hazzard's] complaints have metamorphosed into a separate entity, allowing the suffix 'by history' to become affixed to any subsequent diagnosis of 'carpel tunnel syndrome.'" (R. at 19.) The fact that Dr. Bongu failed to provide a speck of objective evidence to support his diagnosis of carpel tunnel syndrome is glaring since he was specifically asked to provide such information. (R. at 254-55.) This lack of corroborative evidence militates against Hazzard's position. *See Kendrick*, 998 F.2d at 458; *Bennett v. Massanari*, No. NA 00-213-C-H/S, 2001 WL 1165515, at *5 (S.D. Ind. Aug. 20, 2001).

Contrary to Hazzard's assertion, Dr. Dovale did not state that further testing was necessary to rule out anything. He did not recommend that any particular test be performed. He did not even opine that Hazzard's symptoms were characteristic of carpel tunnel syndrome. (R. at 179-80.) Rather, he speculated as to the cause of Hazzard's complaints since the examination for carpel tunnel syndrome did not support a diagnosis of carpel tunnel syndrome. (R. at 180.) By mentioning that Hazzard had a full range of motion in the C spine, after stating that Hazzard's complaints could be caused by radicular symptoms, Dr. Dovale added speculation on top of speculation. (R. at 180.) The ALJ acknowledged all of this speculation but chose not

to explore it. (R. at 19.) Hazzard fails to tell us why this constitutes error—that is, what additional tests should have been conducted and what additional facts could have been obtained. This adds to our reluctance to find that the ALJ failed to develop the record. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

### D.     Treating Source Medical Opinions

Next, Hazzard contests the ALJ's treatment of treating source opinions submitted by Dr. Bongu on the severity of Hazzard's shoulder and wrist pain and asthma. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the ALJ finds that a treating source's opinion is not entitled to controlling weight, the ALJ may reject the opinion or still defer to the opinion and adopt it, but, in any event, he must provide specific reasons for the weight given to the opinion. SSR 96-2p. Conflicts in the evidence are resolved by the ALJ. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987). In this regard, the ALJ may credit one treating physician's opinion over the opinion of another treating physician, or the ALJ may credit a consulting physician's opinion over the opinion of a treating physician. *Id.*; *Garrow v. Shalala*, No. 3:93-CV-261 RG, 1994 WL 686780, at *4 (N.D. Ind. July 19, 1994). The court's role is limited to determining whether the decision is supported by substantial evidence.

Dr. Bongu, a treating physician, opined that Hazzard's shoulder and wrist pain precluded her from performing any type of work on a sustained basis. (R. at 256.) He also opined that

Hazzard's asthma precluded her from working at any type of job that required an eight-hour workday. (R. at 260.) The ALJ ended up discounting these opinions for one or more reasons. He relied primarily on other evidence in the record to support his conclusion that Hazzard was capable of performing a wide range of light work. (R. at 19.)

We find that the ALJ properly discounted Dr. Bongu's shoulder pain opinion because it was unexplained and unsupported by the record as a whole. Indeed, Dr. Bongu's two-page report provided no explanation for such a severe limitation. (R. at 256.) Hazzard herself testified that her shoulder pain was tolerable for four to six hours after taking Tylenol. (R. at 38-39.) She was able to drive a car without difficulty and perform some household chores. Dr. Dovale, the consulting physician whose opinion the ALJ adopted, found that Hazzard's range of motion and shoulder strength were normal. (R. at 179.) Finally, Drs. Donelan and Kenney concluded that Hazzard was capable of performing the exertional requirements of medium work despite her shoulder condition. (R. at 201-03, 210-12.)

The ALJ also properly discounted Dr. Bongu's wrist pain opinion because it was unexplained, unsupported by objective evidence, and unsupported by the record as a whole. Nowhere in Dr. Bongu's two-page report does he explain why Hazzard's wrist pain was disabling. (R. at 254, 256.) Tests conducted by Dr. Dovale did not evince carpel tunnel syndrome. (R. at 180.) Again, Hazzard engaged in some daily activities such as driving that were inconsistent with disabling wrist pain. Drs. Donelan and Kenney concluded that Hazzard was capable of performing the exertional requirements of medium work despite her wrist condition.

Lastly, the ALJ properly discounted Dr. Bongu's asthma opinion because it was unexplained and unsupported by the record as a whole. Dr. Bongu left blank the line for his

explanation of why Hazzard could not perform any type of work. (R. at 260.) The most recent

medical tests were unremarkable; for instance, the September 1998 pulmonary function study

revealed no obstructive lung defect and mild restrictive lung defect, which was interpreted as a

good response to the bronchodilator. (R. at 264.) The medical notes contained in the record

indicate that Hazzard's asthma has been stable. Dr. Lubben, whose opinion the ALJ adopted,

opined that Hazzard was capable of performing work-related activities such as sitting, standing,

moving about, lifting, carrying, and handling objects. (R. at 176.)

Hazzard argues that the ALJ ignored or disregarded Dr. Bongu's opinions. To the

contrary, the ALJ referenced, discussed, and even credited Dr. Bongu's opinions to a certain

extent, just not to the extent that Hazzard would like. This does not create any error for the

reasons stated above. *See Garrow*, 1994 WL 686780, at *4.


### E. Credibility Determination

Hazzard next challenges the ALJ's finding that Hazzard's complaints of disabling pain

were not credible. It is well settled that an ALJ's credibility determination will not be disturbed

unless it is patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Pope v. Shalala*,

998 F.2d 473, 487 (7th Cir. 1993). Freedom to review a credibility determination is especially

limited where the determination is based on subjective considerations that "'leave no trace that

can be discerned [from the transcript].'" *Herron*, 19 F.3d at 335 (quoting *Ehrhart v. Secretary of

Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992). But when a credibility determination

is based on objective factors or fundamental implausibilities, rather than subjective

considerations, district courts have more freedom to review the ALJ's determination. *Id.*

To find that Hazzard's allegations of pain precluding any type of substantial gainful activity were not credible, the ALJ relied on Hazzard's daily activities, the medication she takes to alleviate pain, and the medical evidence. (R. at 17-19.) For instance, Hazzard drives without difficulty, regularly attends church activities, and does some housework. In his cardiac report and respiratory report, Dr. Lubben placed no limitations on Hazzard's ability to perform work-related activities. (R. at 172, 176.) Even Dr. Bongu reported that Hazzard had capabilities greater than that to which Hazzard testified. (R. at 259-60.) The fact that Hazzard's sole medication for shoulder pain was Tylenol influenced the ALJ's credibility determination. Hazzard herself testified that Tylenol made her shoulder pain tolerable for four to six hours. (R. at 38-39.) Moreover, Dr. Dovale commented that Hazzard's ability to grasp was intact, that her gait was normal, and that Hazzard had full range of motion throughout her extremities. Lastly, the treatment that Hazzard received from physicians did not support a total restriction from work. In light of this and other evidence, we do not believe that the ALJ's credibility determination was patently wrong.

## F.    Substantial Evidence

Lastly, Hazzard contends that the ALJ's decision lacks substantial evidence because a vocational expert did not testify at the hearing.[5] An administrative law judge may not rely on the Grids to determine whether a claimant is capable of performing work in the economy where the claimant suffers from nonexertional limitations that "are so severe as to limit the range of work that [the claimant] can perform." *Herron*, 19 F.3d at 336; *Wooldridge v. Bowen*, 816 F.2d 157, 161 (4th Cir. 1987); *Warmoth v. Bowen*, 798 F.2d 1109, 1112-13 (7th Cir. 1986); *Nelson v. Secretary of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). In such a case, the Grids can provide a framework to guide the ALJ, but the ALJ should use the services of a vocational expert to determine "what work, if any, the claimant is capable of performing." *Nelson*, 770 F.2d at 684; *see* SSR 83-14.

Here, the ALJ found that Hazzard's capacity to perform light work was reduced by her inability to work around dust, fumes, or vapors. (R. at 20.) The ALJ relied on Grid Rule 202.13, rather than contacting a vocational expert, apparently because Hazzard's "capacity for the full range of light work has not been significantly compromised by her additional nonexertional limitations." (R. at 21.) This may very well be the case; however, the record is devoid of any evidence relating to the effect of Hazzard's nonexertional limitations on her ability to perform the full range of light work. *Warmoth*, 798 F.2d at 1112-13. Further, we are unable to find a Social Security Ruling directly on point to fill in the gap in the evidence. *See* SSR 96-9p; SSR 83-14.

---

[5] Hazzard also contends in a single sentence without any citation that the ALJ's decision lacks substantial evidence because a medical expert did not testify at the hearing. (Hazzard's Mem. Supp. Mot. Summ. J. at 15.) We dismiss Hazzard's argument because we cannot fathom why the ALJ would have had a duty to call a medical expert in this case.

We therefore conclude that the ALJ erred by determining that Hazzard's nonexertional limitations did not significantly reduce her ability to perform the full range of light work. Substantial evidence does not support this determination. On remand, the ALJ should contact a vocational expert to assess the range of light work that Hazzard is capable of performing considering her nonexertional limitations. We find no reason for the ALJ to revisit his finding that Hazzard was capable of performing the exertional requirements of light work. This finding is supported by substantial evidence. (*See* R. at 38-39, 172-73, 176, 201-04, 177-80, 210-13.)

## V.   Conclusion

This Court recommends that Hazzard's Motion for Summary Judgment be granted in part and denied in part, and that the case be remanded to the ALJ for further proceedings as stated above.

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:**  March 19, 2002.

Written objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Joan B. Gottschall within ten (10) days after service of this Report and Recommendation. *See* FED. R. CIV. P. 72(b). Failure to object will constitute a waiver of objections on appeal.

Copies have been mailed to:

SHEILA R. WOODS, Esq.
P.O. Box 1384
Oak Park, IL 60304

JAMES KUHN
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, IL 60604

THOMAS W. CRAWLEY
Regional Chief Counsel
PATRICK NAGLE
Assistant Regional Counsel
Social Security Administration
200 West Adams Street
30th Floor
Chicago, IL 60606

Attorney for Plaintiff

Attorneys for Defendant